1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROYCE A. BARRETT,

11              Petitioner,              No. CIV S-97-1106 LKK JFM P[1]

12        vs.

13   ROBERT MEEKS,

14              Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16            Petitioner is a former state prisoner on parole proceeding through counsel with an

17   application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his

18   1993 conviction on charges of failure to file employer and personal tax returns in violation of

19   state law.  Petitioner claims that his Sixth Amendment right to counsel was violated when he was

20   _____

21        [1] On June 25, 1998, this action was dismissed without prejudice.  On June 4, 1999,
     petitioner filed a motion seeking relief from this judgment pursuant to Fed. R. Civ. P. 609(b) in
22   Case No. CIV S-98-2226 LKK JFM P.  On September 3, 1999, that motion was denied.  On
     August 29, 2003, in Case No. 02-17044, the Ninth Circuit Court of Appeals reversed the district
23   court's order denying the Rule 60(b) motion.  By order filed December 5, 2003, the district court
     ordered that all documents filed in Case No. 98-2226 LKK JFM P be transferred into the instant
24   action, and Case No. 98-2226 was ordered closed.  The instant action is proceeding on
     petitioner's petition for writ of habeas corpus originally filed November 17, 1998, in CIV S-98-
25   2226, respondent's answer, filed December 20, 1999, in CIV S-98-2226, and petitioner's
     traverse, filed January 24, 2000, in CIV S-98-2226.  These documents are now located in the
26   instant action, CIV S-97-1106 LKK JFM P, as attachments to the court's December 22, 2003
     order.  (Docket No. 47.)

                                      1

1   denied the assistance of counsel at trial and that his Fourteenth Amendment right to due process

2   was violated when the trial court refused to give a jury instruction that he requested and when the

3   trial court gave an erroneous instruction on the difference between employees and independent

4   contractors.

5                         FACTUAL BACKGROUND[2]

6       [Petitioner] is a chiropractor who operated a clinic in Redding.  In
        1985, after losing an administrative appeal, he was assessed
7       $6,438.24 by the Franchise Tax Board for unpaid income tax for
        the 1983 tax year.  For the tax year 1985 the [petitioner's] adjusted
8       gross income was $161,624.  For the tax year 1986 his adjusted
        gross income was $198,707.  He failed to file a personal income
9       tax return with the Franchise Tax Board in either year and paid no
        state personal income tax in either year.

10

11      On September 25, 1978, [petitioner] filed a form with the
        Employment Development Department (EDD) registering as a
12      prospective employer in connection with his chiropractic clinic.
        [Petitioner] filed a form DE-3, a quarterly employee payroll
13      withholding tax return, declaring that he paid $1,479.77 in wages
        for the quarter ending April 30, 1979.  This was the last DE-3
14      [petitioner] filed reporting the payment of wages.  EDD sent him a
        form notice demanding a DE-3 for the next quarter.  [Petitioner]
15      returned the notice with a declaration that he had paid no wages
        during that quarter and requesting that his name be removed from
16      the employer mailing list.  He filed a DE-3 for the third quarter of
        1979 declaring that he paid no wages that quarter.

17      During 1986 eight or nine people other than the [petitioner] were
        paid for work at the clinic.  In 1987 the number rose to 13.  Some
18      were paid on an hourly basis, some on a per treatment basis, and
        others were salaried.  The officer manager of the clinic from
19      January 1986 through January 1988 was the [petitioner's] nephew,
        Ronald Hibler.  During this time the [petitioner] received income
20      for services provided at the clinic from insurance companies and
        by cash or check from patients.  All the income was recorded in the
21      office computer.  The checks were deposited by Hibler, but the
        [petitioner] retained the cash from his patients.

22
        During Hibler's tenure no deductions were made in the payments
23      to clinic workers for withholding of taxes or social security.  The
        [petitioner] explained this to Hibler during his initial interview

24

25          [2]  The facts are taken from the opinion of the California Court of Appeal for the Fifth
        Appellate District in People v. Barrett, No. C016755, (February 19, 1997), a copy of which is
26      attached as Exhibit C to Respondent's Answer, filed December 20, 1999.

before he was hired:  the [petitioner] did not believe that paying taxes was legal or an obligation and would not force others to perform that function that he did not believe in.  Hibler "signed a piece of paper with [his] uncle classifying [him] as an independent contractor."  During Hibler's tenure no 1099 forms, used to report payments to nonemployees, were generated as to the payments to clinic workers.

Robert Smith, an EDD auditor, reviewed records of the [petitioner's] chiropractic clinic and interviewed its workers.  EDD uses a regulatory test based on common law to distinguish between employees, whose wages must be reported on a DE-3 form, and independent contractors, payments to whom are not required to be reported on a DE-3 form.  In Smith's opinion, based upon [petitioner's] supervision of and control over the workers, the nature of their work, the lack of any worker investment in the clinic, and a statutory requirement that unlicensed persons performing services in a chiropractor's office be under the chiropractor's direct supervision at least 50 percent of the time, the workers in the [petitioner's] office were employees who received wages and for whom a DE-3 report was required.

When the prosecution concluded its case-in-chief the [petitioner] offered no evidence.  In his closing argument to the jury, the [petitioner], in pro per, made the following pertinent claims.  I employed the people in my office only as independent contractors. I relied on 1099 forms filed by insurance companies for reporting that income.  I would not sign a personal income tax report form and waive my Fifth Amendment right to privacy and my first Amendment right not to speak.  Having to waive these rights by signing tax forms is totally unconstitutional.  Where is the injury here?  The government never demanded information from me to establish that the workers were employees rather than independent contractors.  The question of their status was never adjudicated.  I have no power under statutes to compel workers to submit a W-4. Taxation is constitutional.  However, the government has plenty of information; we do not have to be compelled to self-assess.  I did not evade taxes.

People v. Barrett, slip op. at 2-5.

<div align="center">ANALYSIS</div>

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

/////

1    (1) resulted in a decision that was contrary to, or involved an
      unreasonable application of, clearly established Federal law, as
2    determined by the Supreme Court of the United States; or

3    (2) resulted in a decision that was based on an unreasonable
      determination of the facts in light of the evidence presented in the
4    State court proceeding.

5    28 U.S.C. § 2254(d).

6        Under section 2254(d)(1), a state court decision is "contrary to" clearly

7    established United States Supreme Court precedents if it applies a rule that contradicts the

8    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

9    indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

10   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

11   (2000)).

12       Under the "unreasonable application" clause of section 2254(d)(1), a federal

13   habeas court may grant the writ if the state court identifies the correct governing legal principle

14   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

15   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

16   simply because that court concludes in its independent judgment that the relevant state-court

17   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

18   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

19   123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

20   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

21       The court looks to the last reasoned state court decision as the basis for the state

22   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

23   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

24   habeas court independently reviews the record to determine whether habeas corpus relief is

25   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

26   /////

4

II. <u>Petitioner's Claims</u>

      A.  Denial of Right to Counsel

          Petitioner contends he was required by the trial court to proceed to trial without the assistance of counsel, violating his Sixth Amendment right to counsel.  Petitioner maintains that a "defendant's unwillingness to provide financial information that could be used to incriminate him[3] in a pending criminal proceeding is not a waiver of the right to counsel." (Traverse at 6.)  Respondent argues petitioner waived his right to counsel by failing to timely retain private counsel.

          The Third District Court of Appeal resolved this claim as follows:

> A criminal defendant has the right to representation by counsel of his choice if he is financial able to retain counsel; if he is not financially able to retain counsel he is entitled to have counsel appointed for him.  "As a general rule, a defendant's right to appointed counsel exists only if he is unable to afford retained counsel."  (See 5 Witkin and Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2758, p. 3330.)  "'[I]n essence the test applied is whether or not a private attorney would be interested in representing the defendant in his present economic circumstances.' (Note, 13 Stan.L.Rev. 522, 546.)"  (*In re Smiley* (1967) 66 Cal.2d 606, 620.)  Discretion is conferred on trial judges to decide the question involved because they are in the best possible position administratively.  (*Ibid*.)
>
> The [petitioner] submits that the trial court erred in applying an incorrect standard.  He submits that the trial court used the standard of whether he was "indigent," rather than "unable to employ counsel."  The latter phrase is used in Penal Code section 987, which addresses appointment of counsel when a defendant appears at arraignment without counsel.  There is no difference in the content of these two phrases.  (See, e.g., *Williams v. Superior Court* (1964) 226 Cal.App.2d 666, 672.)
>
> The [petitioner] argues that "unable to employ counsel" is a broader statement which extends beyond a lack of funds to "some other reason(s)."  However, he does not suggest what these other reasons might be or what legitimate reason other than lack of finances might have been a factor which was operative in this case

[3]  "If Mr. Barrett maintained a sizeable income, he would have been obligated to file and pay required taxes.  If he failed to do so, this "other act" evidence could have been used against him in the pending criminal prosecution.  <u>See</u> Calif. Evid. Code § 1101(b)."  (Traverse, at 6, n.7.)

but wrongfully disregarded by the trial court. Insofar as the implied premise is result oriented, i.e., that any reason for failing to retain private counsel suffices, we reject it. A host of reasons for failure to retain counsel lie in the domain of unwillingness to retain counsel; this condition does not meet the criterion for appointment of counsel.

The [petitioner] also argues that the trial court erred in failing to appoint counsel because he never made an unequivocal assertion that he wished to represent himself. However, conduct as well as a statement can constitute a waiver of the right to appear with counsel. (See, e.g., *People v. Ferry* (1965) 237 Cal.App.2d 880, 890-891.) If the trial court properly determined that the [petitioner] was able to retain counsel during the period afforded him, but refused to do so, it was permitted to conclude that the [petitioner] was simply evading trial through the manipulation of his right to counsel claim. If so, it was justified in finding that he waived the right to appear with counsel.

The question then is whether there is substantial evidence in support of the finding that the [petitioner] was able to retain a private attorney in his economic circumstances. The [petitioner] argues that there is not substantial evidence of ability because his testimony was that various attorneys with whom he communicated requested retainers that were beyond his means. He asserts this shows an abuse of discretion in this case because in *Ferry, supra,* this court commented that the trial court should have made a finding of indigence where the defendant had only discussed representation with three attorneys who were unwilling to accept the case. *Ferry* is not analogous on this point.

In *Ferry* the defendant's only economic resource was a place of real property worth $5,000 that was in probate. He enlisted the assistance of the public defender in obtaining private counsel and discussed the matter with three attorneys. "[A]ll of them quickly realized that defendant's property, consisting of the 40 acres of land under probate was presently unavailable." (237 Cal.App.2d at p. 888.) In light of the defendant's 11 children, none of the attorneys was willing to take a note secured by the property as compensation.

In this case, taking the [petitioner's] representation at face value, he presently had available net cash income from his chiropractic practice of approximately $7,000 per month, and net disposable income, even maintaining his previous lifestyle, of approximately $4,000 per month. The [petitioner] implies that this is insufficient to afford an inference that "a private attorney would be interested in representing the [petitioner] in his present economic circumstances" in light of his showing that the attorneys with whom he made contact refused to take his case unless he paid a large retainer in advance. However, the trial court could

reasonably conclude that the [petitioner's] evidence of the disinterest of the private bar was not representative.

The manner in which the [petitioner] purported to solicit the assistance of counsel was ineffectual.  The only effort he made on his own behalf was his dilatory and off-putting "dear attorney" letter.  The letter contrives to overstate the difficulty of his case and to signal that he is headstrong and opinionated.  The [petitioner's] failure to make a single appointment to speak with a private attorney in person in the long interval available to him is unaccountable.  Perhaps most telling, the [petitioner] offered no rebuttal to the charge that, despite repeated encouragement, he failed to meet with the only attorney who expressed interest in accepting his case.

We discern nothing arbitrary or capricious in the trial court's conclusion that the [petitioner's] showing that, despite his ample income, the private bar would be uninterested in representing him was disingenuous and manipulative.  There is no abuse of discretion presented in the trial court's conclusion that [petitioner] was able to retain an attorney, but *unwilling* to do so and by indiligence had waived his right to appear with counsel. [Petitioner's] contention of error in failing to appoint counsel to represent him is not meritorious.

*A fortiori*, the [petitioner's] related contention that the trial court erred in failing to appoint counsel to assist him in acting as his own counsel also fails.  The [petitioner] laments that he was not competent to represent himself without the assistance of advisory counsel.  However, that is virtually always the case when a defendant elects to represent himself.  More to the point, there is no right to appointment of advisory counsel by the trial court for one who is able to retain a private attorney.  The same reasons which justify the denial of appointment of counsel to represent the [petitioner] justify the denial of advisory counsel.

(People v. Barrett, slip op. at 29-33.)

THE COURT RECORD

The court record reflects the following.  Prior to petitioner's first trial, on May 9, 1991, during further proceedings for appointment of counsel, petitioner refused to fill out a financial declaration and the court issued the following admonition:

I am going to give you the *Faretta*[4] admonishment.
. . .

[4] Faretta v. California, 422 U.S. 806, 812 (1975).

7

1
2
3

> If you continue to take the position of I am not in the position to
> make a decision, then I – with full knowledge of your Faretta
> rights, then you will have the option either of representing yourself
> or hiring an attorney unless you give the Court a basis to appoint
> counsel.

4 (April 13, 1994 Reporter's Augment on Appeal ("RAA") at 48-49.)  Petitioner later responded:

5
6

> Given this information that you have just related to me, I
> understand that you're in a position to where you can declare this a
> forfeiture, and I am not in any way trying to obstruct that.

7 (RAA 49.)  The court took a break, then returned and offered the following admonitions:

8
9
10
11
12

> THE COURT:  Dr. Barrett, since you have declined to fill out the
> financial declaration, consequently there are two choices open to
> you, are either to retain a private attorney or to represent yourself.
> In deciding whether to represent yourself, I need to go through the
> following discussion with you.
> First of all . . . I must advise you that self-representation by the
> accused, a layperson, is almost always unwise, and it may conduct
> – in that you may conduct a defense ultimately to your own
> detriment.  Do you understand that?

13

> THE DEFENDANT:  Yes, I do.

14 (RAA 50.)  The court went on to confirm that petitioner would not be entitled to any special

15 treatment or assistance by the court or the prosecution.  (RAA 51-52.)  Petitioner confirmed he

16 had an associate of arts degree and a four year chiropractic degree and was able to read and write.

17 (RAA 52-53.)  When asked whether petitioner had any further questions, petitioner responded:

18 "I am not voluntarily waiving my right of counsel."  (RAA 54.)  The court responded:

19
20
21

> THE COURT:  That's what I expected you to say frankly, Dr.
> Barrett.  I think you're taking this – this is a defense approach
> you're taking to your prosecution, and so I understand your
> position.

22
23
24
25

> Do you understand the Court's position that unless you give the
> Court a basis to make a finding that you cannot retain private
> counsel and that you request court-appointed counsel as you have,
> that I can't provide you with a free attorney at public expense
> merely because you refuse to give me the information to make that
> decision, and so if you end up, then – if you do not hire an attorney,
> Dr. Barrett, you would be in effect representing yourself?  Even
> though you don't say, "I am representing myself, Judge," the Court
> will treat you as being a pro per defendant until you hire counsel.

26

1    THE DEFENDANT:  I will be attempting to represent myself as
2    best I can at this particular point in time.

3    (RAA 54-55.)

4    On June 20, 1991, during settlement negotiations, petitioner protested he had not

5    waived his right to an attorney, and the court reminded petitioner that he had been deemed by the

6    court to be pro per because of his choices.  (RAA at 119.)  "You have chosen by your failure to

7    hire an attorney or to fill out the financial declaration, to request a court-appointed attorney, your

8    failure to do either of those acts, has resulted in your representing yourself after the Faretta

9    admonition."  (RAA at 119-20.)

10    On August 22, 1991, in connection with petitioner's motion to set aside the

11    charges under Cal. Penal Code § 995 because he was forced to represent himself at the

12    preliminary hearing without an attorney, petitioner was represented by public defender Howard

13    Welch.  (Reporter's Transcript on Appeal ("RT") at 1-2.)  The court reminded petitioner he had

14    been given a full <u>Faretta</u> admonition and that "by refusing to hire counsel and refusing to fill out

15    a financial declaration . . . had elected to represent himself."  (RT at 2.)  Counsel Welch objected

16    that this decision was erroneous and argued the court was required to appoint counsel and "then

17    at the close of the proceeding make a determination of his ability to reimburse the county for the

18    cost of providing that representation."  (RT at 2-3.)

19    On December 12, 1991, private attorney Raymond Grueneich substituted in as

20    counsel for petitioner.  Jury selection began on April 30, 1992.  The trial court declared a mistrial

21    at petitioner's first trial on June 17, 1992.  (CT 1776-84.)

22    On June 25, 1992, the trial court continued the matter for further proceedings re

23    counsel, amended information and further settlement discussions, and set a trial readiness

24    conference for August 27, 1992 and jury trial for September 1, 1992.  (CT 1785.)

25    On July 2, 1992, further proceedings were held by the trial court.  (Reporter's

26    Augment on Appeal ("RAA"), dated April 14, 1994, at 164.)  Mr. Grueneich advised the court

9

that he would be suspended by the California bar on July 4, 1992, and asked the court to grant

petitioner a continuance to retain new counsel or to appoint counsel for petitioner.  The court

acknowledged petitioner's potential earning ability, noting petitioner had not disputed the

Franchise Tax Board's estimates of his adjusted gross income of $160,000.00 to $190,000.00 in

1985 and 1986.  (RAA 167; 169; 174, 181.)  Petitioner's counsel stated "based upon . . . your

definition of indigency as articulated on April 29, 1991, [petitioner] would be claiming

indigency."  (RAA 170.)  The trial court inquired whether petitioner was formally requesting

court-appointed counsel and stated:

> If he does that, he can fill out the declaration; we will have an *in camera* hearing.  He doesn't get the use immunity.  He gets the protection of 987, the legal protection the law provides, and we can discuss the appointment of counsel.  If he wants to do that, he should do that right away, and he should make that decision now.
> . . .
> Otherwise he's on his own to hire counsel or represent himself.  He's received a full Faretta admonition.  He can make that decision.  He's free to represent himself if he wishes.  He has that Constitutional right.

(RAA 174-75; see also 193-94.)  The court confirmed that the financial declaration would be

sealed and the information discussed in closed session.  (RAA 181; 184-85.)  The court

adjourned briefly and petitioner submitted a partially-completed financial declaration.  (RAA

184-90.)  The court noted petitioner "submitted a declaration under penalty of perjury that

list[ed] no financial information."  (RAA 190.)

The court ordered petitioner would proceed in propria persona "as of July 3, 1992

at midnight."  (CT 1786; RAA 176; 194.)  The September 1, 1992 trial date was again

confirmed.  (Id.)

On August 27, 1992, a trial readiness conference was continued to August 31,

1992 for "further proceedings re jury trial, court appointed counsel and use immunity, etc."  (CT

1789.)  On August 31, 1992, petitioner filed an "Affidavit Certifying Non-Readiness" for trial.

/////

(CT 1790.)  Petitioner informed the trial court he was not prepared to proceed to trial, stating, *inter alia*:

> 2.  To the best of my understanding I have not waived my right to counsel at any time during either the Municipal or Superior Court stages of this case.  I have not and do not knowingly, voluntarily and willingly waive assistance of counsel.

> 3.  I have no counsel to represent me.  I am financially unable to obtain trial counsel.  Due to my continuing I.R.S., F.T.B., and E.D.D. liens on my business I am unable to get any type of loan to help finance my case.  I have no ownership in real property.

> 4.  I remain unrepresented and unable to represent myself and therefore am not prepared to proceed to trial.

(CT 1792.)  Petitioner then requested the court appoint counsel to represent him, citing California Penal Code § 987.2(a), et seq.,[5] and asked that payment to counsel be deferred under California Penal Code § 987.8.[6]  (CT 1792.)  Petitioner stated he was "not competent to proceed pro per in this matter."  (CT 1793.)  If the trial court denied petitioner's request for appointment of counsel, petitioner then asked for a <u>Marsden</u>[7] hearing "given the fact that this court will have effectively

---

[5] "In any case in which a person . . . desires but is unable to employ counsel, and in which counsel is assigned in the superior court to represent the person in a criminal trial, proceeding, or appeal, the following assigned counsel shall receive a reasonable sum for compensation and for necessary expenses, the amount of which shall be determined by the court, to be paid out of the general fund of the county. . . ."  Cal. Penal Code § 987.2(a).

[6] "Upon a finding by the court that a defendant is entitled to counsel but is unable to employ counsel, the court may hold a hearing or, in its discretion, order the defendant to appear before a county officer designated by the court, to determine whether the defendant owns or has an interest in any real property or other assets subject to attachment and not otherwise exempt by law. The court may impose a lien on any real property owned by the defendant, or in which the defendant has an interest to the extent permitted by law. The lien shall contain a legal description of the property, shall be recorded with the county recorder in the county or counties in which the property is located, and shall have priority over subsequently recorded liens or encumbrances. The county shall have the right to enforce its lien for the payment of providing legal assistance to an indigent defendant in the same manner as other lienholders by way of attachment, except that a county shall not enforce its lien on a defendant's principal place of residence pursuant to a writ of execution. No lien shall be effective as against a bona fide purchaser without notice of the lien."  Cal. Penal Code § 987.8(a).

[7] In <u>People v. Marsden</u>, 2 Cal. 3d 118 (1970), the California Supreme Court held that a trial court must permit a defendant seeking a substitution of counsel after the commencement of

appointed me as my own counsel and I believe I am not competent to represent myself." (CT 1795.)  Petitioner attached points and authorities to his nine page declaration and stated that he contended the Faretta advisement falls short of a Faretta waiver.  (CT 1799.)

On August 31, 1992, petitioner refused to file a financial declaration unless use immunity was granted.  (CT 1801.)  The trial court stated it "seriously questioned" the information petitioner earlier provided that caused the court to initially appoint the public defender.  (RAA 198.)  "The information in the financial declaration I frankly don't believe is accurate, and . . . I am not appointing the public defender."  (RAA 198.)  The trial court declined to appoint the public defender to represent petitioner because petitioner failed to provide the court "with a basis to find indigency."  (RAA 199.)  The court advised petitioner the matter would proceed to trial:

> MR. BARRETT:  So I will be forced to trial without any type of an attorney?  Is that what you're telling me?
> THE COURT:  You're your own attorney, Dr. Barrett.  I have given you a full Faretta admonition.
> . . .
> You had private counsel that were retained.  I have nothing before me to indicate that you can't retain private counsel.  You're choosing to represent yourself.

(RAA 200.)  The September 1, 1992 trial date was again confirmed.  (CT 1801; RAA 200.)  The court denied petitioner's request for a Marsden hearing.   (CT 1801.)

On September 1, 1992, the trial court held further proceedings re jury trial.  (CT 1802.)  Petitioner's request for a continuance was granted and jury trial was re-set for November 10, 1992.  (Id.)

On November 5, 1992, trial readiness conference was held.  (RAA 203-05; CT 1803.)  Petitioner informed the court he was not ready to proceed to trial and was not waiving his right to be represented by counsel.  (RAA 203-05; CT 1803.)  On November 10, 1992, petitioner

the prosecution's case to specify the reasons for his request.

1   filed another Affidavit Certifying Non-Readiness in which petitioner essentially renewed each of

2   his requests in his prior affidavit.  (Compare CT 1804 to CT 1790.)  However, petitioner also

3   stated that the only retainer he could pay as of November 10, 1992 would be $1,000.00.  (CT

4   1805.)  Petitioner also filed a motion to recuse state court judge McEachen from hearing

5   petitioner's case.  (CT 1813.)

6          On November 10, 1992, due to scheduling problems with the deputy district

7   attorney's schedule, the trial court granted petitioner's motion to reset the jury trial.  (CT 1839.)

8   The court heard petitioner's motion for "demand for immediate appointment of attorney for all

9   pretrial, trial and post trial purposes.  The Court states that if [petitioner] Barrett is prepared to

10  lodge financial information with the Court, the Court will consider the request.  The issue of

11  immunity concerning said financial information [was] discussed.  The motion for appointment of

12  counsel [was] denied without prejudice as stated on the record."  (CT 1839.)  Petitioner's motion

13  for disqualification of Judge McEachen was referred to Judge Lund for proceedings pursuant to

14  Cal. Code of Civ. Pro. § 170.3.  (CT 1839.)  Jury trial was continued to February 23, 1993, with

15  trial readiness conference set for February 19, 1993.  (CT 1840.)

16         In his November 20, 1992 verified answer to petitioner's demand for recusal,

17  Judge McEachen stated "It is still my belief that the lawsuit alleging judicial misconduct is in

18  fact an invention and had the purpose of seeking to vacate and delay the scheduled April 28,

19  1992 trial.  It should be noted that Mr. Grueneich[8] has stated on the record that a part of the

20  defense strategy in this case was delay."  (CT 1851-52.)  Judge McEachen also stated

21             As to [petitioner] BARRETT's reference to my comment about
               making his bed and now having to sleep in it, I think that is a fair
22             characterization of the result the [petitioner] has placed himself in
               by virtue of filing a frivolous lawsuit against the public defender's
23             office.  I believe that a private practitioner being apprised of these
               circumstances would not be inclined to represent Dr. BARRETT
24             for fear of being subjected to a frivolous lawsuit.  Dr. BARRETT's
               lawsuit does present problems in finding an attorney who is wiling
25

26         [8] Mr. Grueneich represented petitioner during settlement negotiations.  (CT 966-68.)

1    to subject himself to exposure of attorney misconduct which Dr.
     BARRETT is so readily able to bring.
2
     In exhibit B attached to the Second Demand for Recusal,
3    [petitioner] cites a portion of the August 27, 1992 proceeding in
     which I stated: "One of the advantages to you, Dr. Barrett, that if
4    you are to proceed to jury trial on Tuesday, it would not be before
     this Honorable court." This statement is labeled "the very curious
5    remark of Judge McEachen" and was merely my remark or
     observation to Dr. BARRETT as an incentive to him to proceed to
6    trial in this case where there has been nothing but delay and
     objections to proceeding to trial was the fact that a different trial
7    judge would be entertaining the [petitioner's] motions and requests
     for special jury instructions anew as opposed to the predictability
8    of my rulings when presented with the same motions and proposed
     jury instructions. That statement was merely offered as an
9    incentive to persuade the [petitioner] to proceed to trial in this oft
     delayed and lengthy lawsuit.
10

11   (CT 1852-53.) On December 3, 1992, Judge Lund denied petitioner's motion for recusal and/or

12   disqualification of Judge McEachen.[9] (CT 1859.)

13              On December 14, 1992, attorney Grueneich filed notice of his suspension from

14   the State Bar of California, effective June 14 through October 13, 1991, and from July 4, 1992 to

15   the date of the notice. (CT 1944.)

16              On February 16, 1993, the trial court rule on various discovery motions filed by

17   petitioner and confirmed that trial remained on calendar for February 23, 1993. (CT 2017.)

18              On February 18, 1993, petitioner filed a motion to dismiss the information due to

19   violation of his due process rights. (CT 2018.) Petitioner contended the trial court summarily

20   _____

21        [9] In his ruling, Judge Lund noted with regard to whether Judge McEachen's "expressions
     fall within the Kreling category of reasonable assessments formulated in the scope of judicial
22   duties, it must be observed that the history of the case indicates unusual delays and the recusal of
     one member of the bench in apparent frustration in dealing with that situation. It should also be
23   noted that these remarks constituted a minute portion of a lengthy record in which Judge
     mcEachen has made numerous rulings unchallenged on the ground of bias or partiality, and the
24   content of the remarks had some factual and logical relationship to the issues being litigated at
     the time." (CT 1858 at *, citing Kreling v. Superior Court (1944) 25 Cal.2d 305 (opinions and
25   expressions thereof, even though critical or disparaging to one party's position, are not grounds
     for disqualification if reached after assessment of information required by the performance of the
26   judicial duty to decide the issues in the case.)

denied his discovery motions, thus violating petitioner's due process rights because some of the information sought would have been exculpatory.  (CT 2019.)  On February 19, 1993, petitioner's motion to dismiss was referred to the trial judge.  (CT 2034.)

Petitioner also filed another Affidavit Certifying Non-Readiness for trial on February 18, 1993, in which he again sought the appointment of counsel and expressly stated he was not waiving his right to counsel.  (CT 2025-32.)  Petitioner's motion for appointment of counsel was denied on February 19, 1993.  (CT 2034.)  The court confirmed the matter was set for jury trial on February 23, 1993.  (CT 2034.)

On February 23, 1993, petitioner appeared without counsel.  (CT 2035.)  The trial was continued to March 24, 1993 due to a conflict on the court's schedule.

On February 24, 1993, the District Attorney moved to proceed on fourteen of the original charges.  (Counts 1, 2, 5-11, and 21-25.)  The remaining counts were dismissed.  (CT 2036-38, 2159.)  Further proceedings were held; petitioner's motion to dismiss was denied.  (CT 2036.)

On February 24, 1993, the court held an *in camera* hearing.  (CT 2036-37.) Petitioner testified he was not indigent to the point of needing welfare or not being able to support his family, but he was indigent to the point where he could not retain counsel.  (ICP 76.) Petitioner stated he has no interest in any property and had two used vehicles of minimal value. (ICP 76; 77.)  Petitioner testified that up until a few weeks prior, the IRS had been taking all of the insurance income.  (ICP 77.)  Petitioner testified the IRS had been doing that for many months and "now . . . with the bankruptcy action, we're finally getting just a bit of money back in to try and catch up on our bills."  (ICP 77.)  Petitioner stated he had a son, aged one, and his wife was pregnant with their second child.  (ICP 77.)

Petitioner further testified concerning payments to his chiropractic business, specifically, that the average receipts to his office for services rendered over the prior six months was "around $11,000.00 a month."  (February 24, 1993 *In Camera* Proceedings ("ICP"), at 79.)

15

1   Petitioner testified that his average draw from that amount, after overhead and staff expenses,

2   was $3,000.00 per month.  (ICP at 79.)  When asked whether the developments in the bankruptcy

3   proceeding had affected these figures, petitioner testified that "in the past two and a half weeks,

4   we've probably doubled what we usually would at this particular point in time."  (ICP at 81.)

5   Petitioner testified that his receivables for the first 24 days of February had been "approximately

6   $15,000.00."  (ICP at 82.)

7              Petitioner testified that his spouse was not employed outside the home.  (ICP 79.)

8   He paid $950.00 per month in rent and $1200.00 per month in child support for three children

9   from a prior marriage.  (ICP 80.)  Petitioner was current on his child support payment.  (Id.)

10  Petitioner estimated his monthly his living expenses were $800.00 per month, but stated they

11  would be increased by additional medical expenses from the new pregnancy because he had no

12  health insurance.  (ICP 80.)  Petitioner noted he also tries to send his daughter who is a college

13  student some money when he has some extra.  (ICP 80-81.)  Petitioner testified that all of his

14  savings was spent on "advisory legal counsel, . . . retained counsel [and] writ counsel."  (ICP 80.)

15             Petitioner noted a number of liens and levies had been recorded against him with

16  the County Clerk but he did not have the exact amount.  (ICP 86.)  Petitioner stated he had

17  "absolutely no way to go out and get any type of loan.  I don't have any Visa card, Mastercards.  I

18  have no line of credits with any banks."  (ICP 86.)

19             Petitioner reminded the court that his office had accumulated a large amount of

20  expenses for vendors and suppliers who extended him credit to keep the chiropractic clinic open.

21  (ICP 85.)  Petitioner noted that "when this particular case hits the newspaper, I'm out of business

22  for weeks before I can ever get any type of income established again."  (ICP 85.)

23             Petitioner testified he had brought in an associate about a year ago, but the

24  associate had only brought in 8 new patients during that year.  (ICP 85.)  Petitioner stated he had

25  been supporting that associate for the past year and the associate was "still way in the red."  (ICP

26  85.)

Petitioner recounted his efforts to obtain counsel since Mr. Grueneich was
suspended from the bar.  (ICP 82-84.)  Petitioner stated he had contacted "almost every criminal
attorney in the City of Redding to get some type of price idea. . . .the minimum that they wanted
to look at a case of this nature was $5,000.  Once they looked at it, if they agreed that they would
take on the case, they demanded a immediate retainer of 20,000 to 75,000 to be retained on this
particular case."  (ICP 83.)  Petitioner met with an attorney in Woodland who told petitioner he
could not enter into a financial arrangement with petitioner without permission of the bankruptcy
court.  (ICP 83.)  Petitioner testified he would have an extremely difficult time coming up with
$5,000.00 to get a lawyer to look at his case and all of the attorneys had been adamant about
requiring payment of the full retainer up front.  (ICP 84; 101.)

Petitioner testified that his office practice was established in the nature of a trust
and a corporation in Connecticut is the trustee.  (ICP 86.)  Petitioner denied owning an interest in
the corporation.  (ICP 86.)  Petitioner stated he has a "contractual relationship with the trust to
where [he's] paid per month."  (ICP 86-87.)  Petitioner paid $10,000.00 to set up the trust but is
"a signer on the bank account, so [is] personally involved in the transactions."  (ICP 87.)  Neither
the trust nor the corporation provide services to generate income to the chiropractic clinic.  (ICP
87.)  Petitioner owes no further fees to the trust or the trustee in consideration for what the trust
does.  (ICP 87.)  Petitioner testified there were no additional monies have been held for petitioner
by this trust or the trustee.  (ICP 88-89.)  Petitioner stated he set up the trust for liability
protection because he did not have malpractice insurance.  (ICP 89.)   Petitioner stated the two
automobiles are titled in the trust's name, but no other assets are held by the trust or by petitioner
personally.  (ICP 89-90.)

The *in camera* hearing was adjourned so that petitioner could obtain further
paperwork.  (ICP 91.)  Upon return, petitioner testified that on July 2, 1992, he telephoned every
criminal attorney in the Redding yellow pages, which numbered about twelve.  (ICP 93-94.)
Petitioner's initial contact with counsel was as follows:

1          I indicated to them that we had a 32 count – felony count EDD and
FTB charges pending against us.  We had just completed a seven-
2    week trial which resulted in a hung jury.  Indicated to them that the
case had been in litigation for approximately five years at that
3    particular point in time.  And asked the receptionist to please
convey this information to their particular attorney and if he would
4    give me a call back, I would appreciate it.

5    (ICP 99.)

6          A Mr. Webster returned petitioner's call, but required payment of a $10,000.00

7    retainer before he would meet with petitioner.  (ICP 94-95.)  Jack Suter told petitioner he would

8    require a $25,000.00 to $30,000.00 retainer before he would look at petitioner's case.  (ICP 95.)

9          Petitioner talked with Al Cunningham who had worked on petitioner's case and

10   had projected attorneys fees would run $50-60,000.00.  But Mr. Cunningham was not interested

11   in coming back in as attorney of record.  (ICP 97.)  Petitioner was unable to make contact with

12   Wil Hawes and another attorney, John Kucera, had a conflict that precluded representation.  (ICP

13   98.)  None of the other attorneys returned petitioner's calls.  (ICP 98-99.)

14         Petitioner also contacted Bill Cohen a tax specialist in San Diego who quoted him

15   a $50,000.00 retainer in advance.  (ICP 100.)  Petitioner contacted Kate Wells in Santa Cruz who

16   was unavailable.  (ICP 101.)  Mr. Grueneich contacted Peter Lemming in Santa Cruz but his

17   schedule was booked.  (ICP 102.)

18         All of the above contacts took place in July; petitioner conceded nothing

19   happened in August or September or October.  (ICP 102.)  In late January or early February,

20   petitioner ran into an attorney Paul Bell at the courthouse who offered to look at the history of the

21   case if petitioner had $5,000.00 in cash.  (ICP 103.)  However, Mr. Bell conceded he had no

22   expertise in tax law.  (ICP 103.)  Petitioner asked Mr. Bell if he had any other referrals, but he

23   did not.  (ICP 103.)  Petitioner also talked to a Mr. Tibbits in Woodland but they did not discuss

24   financial information.  (ICP 103-04.)  Petitioner did not contact any criminal defense lawyers in

25   Tehama County, Red Bluff, Butte County, Chico, Oroville, Trinity County Bar, Siskiyou Bounty

26   Bar or Lassen County.  (ICP 104-05.)

18

After the *in camera* hearing, the court minutes reflect the following:

> This Court cannot find that the [petitioner] has not exercised reasonable diligence in locating replacement counsel. Accordingly, the trial cannot go forth in this date.

> The Court finds that Dr. Barrett is not entitled to indigent legal services.

> The Court suggests the [petitioner] contact Lawyer's Reference Service of Shasta County and the equivalent agencies in other counties in Northern California.  Further, he is to contact the California State Bar for possible criminal defense.  These contacts should be explored vigorously.  Alternative means of financing a trial which shall last between two and three weeks should be considered.

(CT 2037.)  The trial court then reset the jury trial for July 13, 1993, with a trial readiness conference set for July 9, 1993.  (CT 2038.)  On April 19, 1993, counsel for petitioner filed a motion for status conference asking the court to ensure petitioner was exercising reasonable diligence in his efforts to locate counsel and to advance the trial date based on the prosecution's unavailability.  (CT 2039.)  On April 19, 1993, the motion for status conference was granted and the matter was continued to April 28, 1993 for status conference.  (CT 2045.)

On April 28, 1993, the court held a status conference concerning petitioner's efforts to retain counsel.  (CT 2083.)  Petitioner reported he had not engaged counsel but presented documentation of his efforts to do so in the form of a declaration.  (Id.)  Petitioner recounted the following efforts to obtain counsel:  March 10, 1993 letter mailed to 81 attorneys; April 7, 1993, four letters mailed to bar associations and one to California State Bar Association; April 21, 1993, letter written to Attorney Referral Service.  (CT 2047-50.)  Petitioner stated he received three responses declining representation, two responses referring him elsewhere and two phone messages.  Petitioner had follow-up contact with an attorney Rasmussen, who wrote petitioner after their initial phone conversation, increasing his fees without explanation, and an attorney Richens, with whom petitioner had some exchange of correspondence.  (Id.)

/////

1    After the court reviewed petitioner's documents, an *in camera* hearing was held

2  on April 28, 1993.  (CT 2083.)  Petitioner submitted letters demonstrating his efforts to contact

3  lawyers by letter and by phone.  (RT 125-26.)  Petitioner confirmed he had not met face to face

4  with any lawyer since February 4, 1993.  (RT 127.)  Petitioner confirmed he advised some

5  potential lawyers the trial would take seven weeks, despite the trial judge's view it would take

6  two to three weeks given the reduction in the charges.  (RT 129.)  Petitioner revised his prior

7  concern concerning medical expenses as his wife miscarried.  (RT 130.)

8    After the *in camera* hearing, the court returned to open session and confirmed the

9  jury trial remained set for July 13, 1993 with the trial readiness conference date set July 9, 1993.

10  Petitioner was directed to personally appear on those dates.  (CT 2083.)  The court found

11  petitioner did not show he could not hire counsel.  (CT 2083.)  The court directed petitioner to

12  make serious efforts to personally contact attorneys rather than letter contact and cautioned

13  petitioner that if he did not have counsel by the time of trial, the court would be forced to make

14  the declaration that petitioner waived counsel by his own actions.  (CT 2083.)

15    On May 17, 1993, the prosecution moved for a continuance of the July 13, 1993

16  trial date, which the court continued to May 20, 1993.  (CT 2084.)  On May 20, 1993, the

17  prosecution's motion to continue trial date was granted.  Jury trial was continued to July 27,

18  1993, with a trial readiness conference date set for July 23, 1993.  (CT 2085.)

19    On July 12, 1993, petitioner filed an affidavit certifying non-readiness for trial.

20  (CT 2086.)  Petitioner reiterates much of his earlier-filed non-readiness affidavits, but also notes

21  he was compelled to file a Chapter 13 Bankruptcy action on May 11, 1993 due to almost $1

22  million in IRS tax liens.  (CT 2087.)  Petitioner declares under penalty of perjury:

23      4.  Since I am currently under the protection of the Bankruptcy
        Court and have been advised that the trustee handling this case will
24      be appointed at the 341A meeting, and to date this meeting has not
        been scheduled by the Bankruptcy court, I have been unable to get
25      permission from the Bankruptcy trustee to assume additional
        liabilities.

26

1   (CT 2087-88.)  Petitioner confirmed he had personally talked with 15 attorneys and that, in

2   addition to his prior efforts to obtain counsel, had been unable to retain counsel.  (CT 2088.)

3   Petitioner reiterated his request for appointment of counsel.  (CT 2089.)

4          On July 22, 1993, the prosecution filed a declaration in which Mark Geiger,

5   supervising Deputy Attorney General, stated he spoke with attorney Richins on July 21, 1993,

6   who advised that he initially quoted petitioner a free for services of $35,000.00, but "repeatedly

7   encouraged [petitioner] to come into his office and talk to him to negotiate the fee and payment

8   terms, telling Dr. Barrett that he needed to have a face-to-face meeting with him to understand

9   the case and review the documents before he could give a more realistic trial fee estimate," (CT

10  2112), but petitioner "never came to his office to discuss the case, to set a more realistic trial fee

11  or to negotiate payment terms."  (CT 2112.)  Copies of Mr. Richins' letters and petitioner's

12  response were provided the court.  (CT 2148-50.)

13         Moreover, Mr. Geiger stated that although petitioner had filed a petition for

14  bankruptcy on May 11, 1993, that petition was the third time petitioner had filed a petition for

15  bankruptcy and the two prior petitions had both been dismissed because petitioner failed to

16  diligently pursue them.  (CT 2112.)  Mr. Geiger stated that he wrote to petitioner suggesting he

17  could ask permission of the bankruptcy court to hire a lawyer prior to the scheduling of a

18  creditors' meeting, but petitioner replied "[t]his very well could be the case but . . . the

19  Bankruptcy court has yet to assign me a trustee" and "[t]he moment the assignment is made I will

20  immediately make a request of the trustee to allow me latitude to incur a post-petition liability in

21  the form of retainer for assistance of counsel to help me on my pending quasi-criminal action."

22  (CT 2113.)

23         Mr. Geiger recounted his contacts with a clerk at the U.S. Trustee's office on June

24  17, 1993, who informed him that Lawrence J. Loheit had been appointed to petitioner's case

25  shortly after the May 11, 1993 petition was filed and confirmed that petitioner had not filed any

26  "application or petition requesting permission to incur a post-petition debt to hire legal counsel in

his criminal case." (CT 2113.)  The clerk also stated "they would be asking the Bankruptcy Court to issue a Notice of Dismissal to Dr. Barrett since he had utterly failed to file the usual forms required in such bankruptcies, including a List of Creditors, a Reorganization Plan, and schedules of assets and liabilities." (CT 2113.)

Mr. Geiger further stated that on June 23, 1993, he spoke with Yvonne Aldana, legal counsel for the U.S. Trustee assigned to petitioner's case, "who advised . . . that if Dr. Barrett were to make application to incur a post-petition debt in order to hire legal counsel to represent him in this criminal action, not only would the Trustee consider the application, he would likely not object to it since the action arose out of the operation of the business and would directly impact Dr. Barrett's continued operation of the business." (CT 2114.)

On July 21, 1993, Ms. Aldana confirmed with Mr. Geiger that petitioner "had not filed any application or sought permission from the U.S. Trustee to incur such a debt and that a Notice of Intent to Dismiss had been served on Dr. Barrett on July 20." (CT 2114.)  A copy of the notice of intent to dismiss was filed with the trial court. (CT 2151.)

Finally, Mr. Geiger stated that Richard Walsh, a former investigator and tax specialist with the Franchise Tax Board familiar with petitioner's IRS liens, "advised that the vast majority of the liens were filed against [petitioner] over 12 months ago and that the total amounts [were] arbitrary and subject to reduction but, because [petitioner] . . . steadfastly refused to file a tax return since at least 1978, the IRS assesses the levy based upon known gross income without deductions. (CT 2114-15.)

On July 22, 1993, the prosecution filed an opposition to petitioner's motion to continue the trial date.  On July 23, 1993, the trial court addressed petitioner's attempts to seek counsel and found petitioner waived counsel based on his own actions. (CT 2155.)  Petitioner's motion to continue the trial date was denied. (Id.)

On July 27, 1993, petitioner filed an affidavit and declaration in which he declared he was financially indigent and that well over $1 million in liens and levies had been recorded in

1  Shasta County against him.  (CT 2156.)  Petitioner declared under penalty of perjury that he was

2  "involved in a current Chapter 13 Bankruptcy action with no additional monies or assets

3  available to [petitioner] that bankruptcy trustee could give [petitioner] permission to use to incur

4  additional liabilities."  (CT 2157.)

5          The second jury trial commenced on July 27, 1993.  Petitioner was found guilty.

6                                  ANALYSIS

7          The Sixth Amendment to the United States Constitution guarantees a criminal

8  defendant the right to the assistance of counsel.  See Powell v. Alabama, 287 U.S. 45, 53 (1932).

9  The Sixth Amendment gives an indigent criminal defendant the right to the assistance of

10  court-appointed counsel.  See Gideon v. Wainwright, 372 U.S. 335, 343 (1963).  The Sixth

11  Amendment also grants a criminal defendant the right to self- representation, if he voluntarily

12  and intelligently elects to do so.  Martinez v. Court of Appeal of California, 528 U.S. 152, 153

13  (2000); Faretta v. California, 422 U.S. 806, 819 (1975).  A waiver of the right to counsel must be

14  voluntary, knowing and intelligent.  Iowa v. Tovar, 541 U.S. 77, 88 (2004); Faretta, 422 U.S. at

15  835.  "The determination of whether there has been an intelligent waiver of the right to counsel

16  must depend, in each case, upon the particular facts and circumstances surrounding that case,

17  including the background, experience, and conduct of the accused."  Johnson v. Zerbst, 304 U.S.

18  458, 464 (1938); see also Tovar, 541 U.S. at 92.  "The right to defend pro se and the right to

19  counsel have been aptly described as 'two faces of the same coin,' United States v. Plattner, 330

20  F.2d 271, 276 (2d Cir. 1964), in that the waiver of one right constitutes a correlative assertion of

21  the other."  United States v. Conder, 423 F.2d 904, 908 (6th Cir.1970).

22          In this case, the California Court of Appeals determined that the trial court did not

23  abuse its discretion in determining that petitioner could afford to hire his own attorney and was

24  not entitled to appointed counsel.  The Court of Appeals further concluded that petitioner was not

25  denied his right to counsel where he failed to retain counsel at his own expense and instead

26  represented himself at trial.

1    After reviewing the record, this court finds that the California Court of Appeals'

2  decision is not contrary to United States Supreme Court precedent nor an unreasonable

3  application of federal law or the facts.  The right to appointed counsel only arises when a

4  criminal defendant establishes his inability to pay for a lawyer to represent him.  See Gideon, 372

5  U.S. at 344 (right to appointed counsel applies only to those who are "too poor to hire a lawyer");

6  United States v. Bauer, 956 F.2d 693, 695 n.2 (7th Cir.1992).

7    In this case, after holding an *in camera* proceeding, at which petitioner testified

8  concerning payments to his chiropractic business, for which he was still practicing, the state trial

9  court determined that petitioner had sufficient means to retain an attorney and refused to appoint

10  counsel.  This decision was reasonable given petitioner's testimony that the average receipts to

11  his office for services rendered over the prior six months was "around $11,000.00 a month."

12  (February 24, 1993 *In Camera* Proceedings, at 79.)  Petitioner testified that his average draw

13  from that amount, after overhead and staff expenses, was $3,000.00 per month.  (Id.)  When

14  asked whether the developments in the bankruptcy proceeding had affected these figures,

15  petitioner testified that "in the past two and a half weeks, we've probably doubled what we

16  usually would at this particular point in time."  (Id. at 81.)  Petitioner testified that his receivables

17  for the first 24 days of February had been "approximately $15,000.00."  (Id. at 82.)  The state

18  court's factual findings regarding this issue are presumed correct and entitled to deference.  See

19  28 U.S.C. § 2254(e) & (e)(1).  Petitioner has not rebutted this presumption with clear and

20  convincing evidence.  Moreover, on collateral review, petitioner bears the burden of establishing

21  "his inability at [the time of trial] to hire an attorney."  See Kitchens v. Smith, 401 U.S. 847, 848

22  (1971).[10]  Petitioner has not done so.  Thus, petitioner has failed to demonstrate he is entitled to

23  habeas relief on any claim that the state court erred in determining he was not indigent and could

24  afford to hire his own attorney.

25

26    [10]  The United States Supreme Court held that Kitchens proved he was without counsel
due to his indigency at the time of his conviction of robbery.  Kitchens, 401 U.S. at 487.

1    However, petitioner contends he is entitled to habeas relief because the trial court

2 failed to obtain a proper waiver of his right to counsel and affirmation of his right to

3 self-representation.  As noted, the United States Supreme Court has made clear that a waiver of

4 the right to counsel and a decision to represent oneself in criminal proceedings must be knowing,

5 intelligent, and voluntary.  See Tovar, 541 U.S. at 88; Faretta, 422 U.S. at 835.  Additionally, a

6 criminal defendant who seeks to proceed pro se must generally be aware of the risks of

7 self-representation so that "he knows what he is doing and his choice is made with eyes open."

8 See Faretta, 422 U.S. at 835.  True waiver does not apply here because petitioner did not state he

9 wished to represent himself.  The record is replete with instances where petitioner insisted he

10 wanted counsel appointed and was not representing himself.

11    The United States Supreme Court, however, has not specifically addressed

12 whether a criminal defendant may forfeit or "waive by conduct" the right to counsel, the issue

13 presented in this case.  The Supreme Court has also not decided a case with facts that are

14 materially indistinguishable from those presented.  See Wilkerson v. Klem, 412 F.3d 449, 454

15 (3rd Cir.2005)(finding that petitioner had forfeited his right to counsel was reasonable); Fischetti

16 v. Johnson, 384 F.3d 140, 150 (3rd Cir.2004)(trial court's decision to compel petitioner to

17 represent himself was not contrary to or an unreasonable application of clearly established federal

18 law).  Accordingly, the California Court of Appeals' decision cannot be said to be contrary to

19 federal law as determined by Supreme Court precedent.

20    Thus, the issue is whether the California Court of Appeals' decision constitutes an

21 unreasonable application of United States Supreme Court precedent or the facts.  The Supreme

22 Court has held that a criminal defendant can forfeit fundamental trial rights such as the right to be

23 present at trial.  See Illinois v. Allen, 397 U.S. 337, 343 (1970) (defendant can lose right to be

24 present at trial by being disruptive despite trial court's warnings regarding such conduct); Taylor

25 v. United States, 414 U.S. 17, 20 (1973) (affirming trial judge's decision to proceed with trial

26 when the defendant failed to return to the courtroom following a trial recess).

1    Federal circuit courts have interpreted the <u>Allen</u> and <u>Taylor</u> decisions to be

2    consistent with the concept of forfeiture or "waiver by conduct" of the right to counsel.  <u>See</u>

3    <u>Wilkerson v. Klem</u>, 412 F.3d 449, 455-56 (3rd Cir.2005) (state court decision that defendant

4    forfeited right to counsel by failing to retain counsel by trial date, despite ample time to do so,

5    was not an unreasonable application of Supreme Court precedent); <u>Gilchrist v. O'Keefe</u>, 260 F.3d

6    87, 97 (2nd Cir.2001), <u>cert. denied</u> <u>Gilchrist v. Smith</u>, 535 U.S. 1064 (2002) ("At a minimum,

7    these cases . . . stand for the proposition that, even absent a warning, a defendant may be found to

8    have forfeited certain trial-related constitutional rights based upon certain types of misconduct");

9    <u>United States v. Meeks</u>, 987 F.2d 575, 579 (9th Cir. 1993)("In limited circumstances, a court

10   may force a defendant to proceed pro se if his conduct is "'dilatory and hinders the efficient

11   administration of justice.'");[11] <u>United States v. Bauer</u>, 956 F.2d 693, 695 (7th Cir.1992), <u>cert</u>

12   <u>denied</u> <u>Bauer v. United States</u>, 506 U.S. 882 (1992) ("the combination of ability to pay for

13   counsel plus refusal to do so does waive the right to counsel at trial.  It is waiver by conduct." );

14   <u>United States v. Kelm</u>, 827 F.2d 1319, 1322 (9th Cir.1987) (defendant's continued refusal to

15   retain counsel or to accept appointed counsel, in an attempt to delay trial, constituted a waiver of

16   right to counsel); <u>United States v. Mitchell</u>, 777 F.2d 248, 257-58 (5th Cir.1985) (defendant who

17   knowingly retains attorney with scheduling conflict and fails to secure other counsel within

18   reasonable time waives right to counsel); <u>United States v. Weninger</u>, 624 F.2d 163, 167 (10th

19   Cir.1980) (in misdemeanor failure to file federal income tax return case, defendant's "stubborn

20   failure to hire an attorney constituted a knowing and intelligent waiver of the right to assistance

21   of counsel" ); <u>see also</u> <u>Sullivan v. Pitcher</u>, 82 Fed. Appx. 162, 165-66 (6th Cir.2003)

22

23        [11]  The <u>Meeks</u> court ultimately found the record did not indicate a knowing and intelligent
     waiver of Meeks' right to counsel.  <u>Id.</u>  Meeks had appointed counsel when the trial court denied
24   Meeks' motion to substitute counsel while, at the same time, the trial court granted appointed
     counsel's motion to withdraw, leaving Meeks unrepresented.  <u>Id.</u> at 579.  The trial court did not
25   make Meeks "aware of the dangers of proceeding pro se," <u>id.</u>, and the record did not reflect
     Meeks was aware of them.  <u>Id.</u>  Meeks had a history of mental illness that also precluded a
26   finding that Meeks had knowingly or intelligently waived his right to counsel.

1   (recognizing that other courts "have not hesitated" to find waiver through conduct); <u>United States</u>

2   <u>v. Titus</u>, 576 F.2d 210 (9th Cir. 1978)(in tax fraud case, defendant waived right to

3   court-appointed counsel by refusing to either hire counsel or to sign form to qualify himself for

4   court-appointed counsel).[12]

5          Given these authorities, this court cannot conclude that the California Court of

6   Appeals' decision constitutes an unreasonable application of United States Supreme Court

7   precedent, or of the facts in light of the record.  It is obvious from the record that petitioner did

8   not voluntarily "waive" his right to counsel as he continued to object to the trial court's

9   determination that he was not indigent and to request the appointment of counsel.  Nonetheless,

10  the California Court of Appeals reasonably determined that petitioner forfeited or "waived by

11  conduct" his right to counsel.

12         However, "in a collateral attack on an uncounseled conviction, it is the

13  defendant's burden to prove that he did not competently and intelligently waive his right to the

14  assistance of counsel.  [Citation omitted.]  <u>Tovar</u>, 541 U.S. 77, 92 (2004).  Petitioner has failed to

15  demonstrate that he did not waive or forfeit his right to the assistance of counsel by his conduct.

16  In the instant case, petitioner does not claim he did not understand the charge or the range of

17  punishment he was facing.  Such protestations would be futile in light of his having been through

18  trial once, albeit previously represented by counsel, as well as a review of the record which

19

20         [12] <u>But see</u> <u>Hanson v. Passer</u>, 13 F.3d 275 (8th Cir. 1994)(criminal defendant who can
    afford to contribute some amount to expense of defense but who cannot afford to hire counsel
21  because of inadequate resources to either pay retainer or assure private counsel of full payment is
    entitled to court-appointed counsel; total indigency is not required to be entitled to court-
22  appointed counsel).  In <u>Hanson</u>, however, the trial court required Hanson to first pay $1,000.00
    before a public defender would be appointed, after finding Hanson was entitled to court-
23  appointed counsel.  <u>Id.</u>
           But see also <u>U.S. v. Goldberg</u>, 67 F.3d 1092 (3rd Cir. 1995)(while record supported trial
24  court's determination that good cause was lacking for defendant's last minute request for
    substitution of counsel and continuance, the record concerning defendant's alleged conduct in
25  threatening his court-appointed attorney's life did not support forfeiture of Sixth Amendment
    right to counsel and failure to advise defendant of the risks of self-representation precluded a
26  finding that defendant's dilatory conduct constituted a "waiver by conduct" of right to counsel).

1   reflects multiple pro se filings that are articulate, well-written and accurately cite legal

2   authorities.  Petitioner rested, instead, on his failed efforts to obtain counsel, which he deemed

3   doomed to failure because he was unable to come up with the required retainer.

4            The record demonstrates that petitioner was put on notice at least as early as May

5   9, 1991 that his failure to complete the financial declaration would result in a denial of

6   appointment of counsel and a finding that petitioner was choosing to represent himself despite

7   his repeated protestation that he did not waive his right to counsel.  (RAA 48-49.)  Petitioner

8   acknowledged this forfeiture in open court:  "Given this information that you have just related to

9   me, I understand that you're in a position to where you can declare this a forfeiture. . . ."  (RAA

10  49.)  Petitioner was reminded of this choice again on June 20, 1991, during settlement

11  negotiations:  "You have chosen by your failure to hire an attorney or to fill out the financial

12  declaration, to request a court-appointed attorney, your failure to do either of those acts, has

13  resulted in your representing yourself after the *Faretta* admonition."  (RAA at 119-20.)

14  Petitioner was similarly admonished on August 22, 1991 (RT 2), on July 2, 1992 (RAA 174-75;

15  see also 193-94) and August 31, 1992 (RAA 200).

16           While the record demonstrates petitioner made some efforts to obtain counsel, the

17  record also reflects petitioner did so in a manner that influenced whether counsel might be

18  interested in taking the case.  It is evident from the record that petitioner would prove to be a

19  difficult client.  In his initial letter sent to 81 attorneys, petitioner characterized his case in such a

20  way as to make the case appear complex and daunting.  And even after many charges were

21  dropped, petitioner continued to speculate that the second trial would take seven weeks rather

22  than the two to three weeks suggested by the trial judge familiar with the case.  Despite

23  petitioner's belief that huge retainers were required to be paid up front, petitioner failed to meet

24  personally with lawyers and personally attempt to persuade them to work out other financial

25  arrangements.  This lack of effort stands out as compared to petitioner's tenacious litigation in

26  /////

1  pro se as well as his comment that he had been able to work out arrangements with vendors and

2  suppliers of his chiropractic clinic who extended him credit to keep the chiropractic clinic open.

3        Petitioner also failed to involve the bankruptcy trustee in his efforts to obtain

4  financing to retain a lawyer.  Although petitioner contends the state court failed to mention

5  petitioner's statement that the bankruptcy court refused to give him the name of his bankruptcy

6  trustee, petitioner did acknowledge that the pending bankruptcy had increased the cash flow into

7  his chiropractic clinic and petitioner has not provided any evidence that once he received the

8  name of the trustee, if he did, that he engaged in any efforts to negotiate a way to finance his

9  legal representation with the trustee.  It is more likely, considering the notice of dismissal issued

10  by the bankruptcy court, that petitioner took no such actions.

11        Finally, on February 24, 1993, petitioner agreed to provide the trial court some

12  financial information in connection with his motion for appointment of counsel, as noted above.

13  At the *in camera* hearing petitioner recounted the additional efforts he had taken in July of 1992

14  to obtain counsel.  (ICP 99-102.)  Petitioner conceded nothing had happened from August

15  through October.  (ICP 102.)  Petitioner also recounted two other efforts he made three or four

16  weeks prior to the *in camera* hearing.  (ICP 103-05.)  The trial court found petitioner could afford

17  to hire his own attorney and gave him 100 days to obtain counsel before trial.  (CT 2037.)

18  Petitioner was free on his own recognizance and not in custody following the mistrial and during

19  the second trial.  (CT 1785.)  Petitioner, however, kept insisting that he was unable to afford his

20  own attorney and refused to retain counsel despite ample opportunity and sufficient means to do

21  so.  He further failed to present sufficient evidence to support his professed inability to hire

22  counsel so as to contravene the trial court's findings.  He then proceeded to represent himself at

23  trial.

24        The trial court attempted on several occasions to employ Cal. Penal Code § 987,

25  but found petitioner had provided insufficient evidence of indigency and failed to demonstrate he

26  was unable to employ counsel.  It is apparent from the record that petitioner was not going to

accept the court's rulings and retain counsel.  These actions by petitioner were reasonably

deemed a forfeiture or "waiver by conduct" of the right to counsel and a concomitant assertion of

the right of self-representation.  "In addition, a court must be wary against the 'right of counsel'

being used as a ploy to gain time or effect delay.  [Citation omitted.]"  U.S. v. Kelm, 827 F.2d

1319, 1322 (9th Cir. 1987).  Here, at least one judge believed petitioner's actions were part of a

defense strategy to delay the trial.  (CT 1851-52.)  Indeed, the start of the second trial was

delayed over one year, from July 4, 1992, when Mr. Grueneich was suspended from practice,

until July 27, 1993.

Even if the trial court did not fully advise petitioner of the dangers of self-

representation on the record, petitioner was aware of the risks of proceeding pro se as his

continued requests for the appointment of counsel at public expense were consistently denied and

Faretta admonitions consistently given.  Further, the record supports a finding that petitioner

knew what he was doing when he refused to retain counsel and represented himself.  He was a

mature adult, well-educated, and professionally-employed during his career, he was advised of

the charge and possible sentence, he was represented by retained counsel for the earlier trial that

ended with a hung jury, and he exhibited some understanding of the law and the proceedings.

A lack of formal warnings does not mean that petitioner did not embark upon self-representation

with his eyes open.  See Swiger v. Brown, 86 Fed. Appx. 877, 881-82 (6th Cir.2004) (finding

valid waiver of counsel, despite the lack of formal warnings about risks of self-representation,

where trial court refused to appoint private legal counsel and indigent petitioner proceeded pro se

rather than continue with counsel from public defender's office).  It would be illogical to require

a formal waiver or formal warnings in the context of this case where petitioner clearly wanted

counsel, but refused to retain counsel at his own expense.[13]

/////

_____

[13]  This is not to say that such warnings are not advisable or that such warnings may not
be constitutionally required in other contexts.

1    Accordingly, petitioner has not established that he was unconstitutionally denied

2    the right to counsel, nor has he shown that he failed to sufficiently waive his right to counsel and

3    elect to represent himself.  This claim should be denied.

4    B.  Jury Instruction Errors

5    Petitioner claims that his Fourteenth Amendment right to due process was

6    violated when the trial court refused to give requested jury instructions relevant to petitioner's

7    mens rea or state of mind, and when the trial court failed to *sua sponte* specifically instruct on the

8    difference between employees and independent contractors.

9    A challenge to jury instructions does not generally state a federal constitutional

10   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021

11   (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

12   1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or

13   application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805,

14   814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a

15   "claim of error based upon a right not specifically guaranteed by the Constitution may nonethe-

16   less form a ground for federal habeas corpus relief where its impact so infects the entire trial that

17   the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658

18   F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980), cert. denied,

19   449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).

20   In order to warrant federal habeas relief, a challenged jury instruction "cannot be

21   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

22   process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

23   (9th Cir. 1988), cert. denied, 488 U.S. 861 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146

24   (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the

25   entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62,

26   72 (1991) (quoting Cupp, 414 U.S. at 147).  In making its determination, this court must evaluate

31

the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984)).

Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

The Third District Court of Appeal resolved these claims as follows:

> We begin by examining the circumstances in which a mistake of law affords a defense to a crime.  "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof."  (People v. O'Brien (1892) 96 Cal. 171, 176.) This means that lack of knowledge that the law proscribes an act is not a defense to its commission.
>
> This principle, however, does not rule out other kinds of mistake concerning the law which do afford a defense to a criminal charge. For example, although it is not a defense to a burglary predicated upon the entry of a structure for the purpose of obtaining property that the intruder did not know that this constituted burglary, it is a defense that the intruder believed he had a legal right to the property  (See People v. Smith (1966) 63 Cal.2d 779, 792-793.)[14]
>
> To draw out this and other relevant distinctions we examine the leading strands of the case law.[15]

---

[14]  In People v. Smith the defendant tendered a mistake of law defense based on the specific intent language in People v. Marsh (1962) 58 Cal.2d 732, 742-744.  Convicted of murder of the first degree on a burglary felony murder theory for a killing that occurred when he was thwarted in an attempt to pass forged checks in a store, he sought to establish that he was ignorant of the law of burglary in California.  The trial court sustained an objection to the question.  The Supreme Court upheld the trial court, reasoning that the specific intent necessary for burglary is the intent to commit larceny or any felony inside the structure and not the intent to commit burglary.  The defendant had conceded that he entered the store to cash a check he knew had been forged; hence it was irrelevant whether he knew that his act violated the law of burglary.  (Id. at pp. 792-793.)

[15]  Both the Attorney General and the [petitioner] cite People v. Vineberg (1981) 125 Cal.App.3d 127, 137, and People v. Flora (1991) 228 Cal.App.3d 662, 669, for the generalization that mistake of law is a valid defense to specific intent crime if it negates the required specific intent.  (Also see, e.g., People v. Howard (1984) 36 Cal.3d 852, 863-864.)  While that is not incorrect, it is incomplete and ties the defense to the unfortunate and ambiguous

The vast majority of cases involve a charge of theft in which the defendant asserts the belief that under the law of property he or she had a right to possess or appropriate the property subject to the charge of stealing.  (See, e.g., *People v. Stewart* (1976) 16 Cal.3d 133.)[16]  This defense finds an early statutory expression in Penal Code section 511:

> "Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable."

The cases applying this section, following the statutory element of "good faith", say the defendant's belief must be both honest, i.e, bona fide, and not "wholly unreasonable."  (See *Stewart, supra*, 16 Cal.3d at pp. 139-140.)[17]

Despite the predominance of theft cases, the defense of ignorance or mistake of law extends beyond cases of theft.  For example, in *People v. Goodin* (1902) 136 Cal. 455, a landowner dug up an old road to close it after opening a new road traversing the same grade as an old road.  The court held that an honest belief that the construction of a new road legally constituted an abandonment of

_____

term "specific intent", which often inhibits rather than advances legal analysis.  (See, e.g., *People v. Fabris* (1995) 31 Cal.App.4th 685, 696, fn. 10 and pp. 698-699; see also *People v. Saille* (1991) 54 Cal.3d 1103 ("specific intent crime", as used in Penal Code section 28 includes murder committed with implied malice); c.f., e.g., *People v. Hood* (1969) 1 Cal.3d 444, 456 and authorities cited therein; 1 Robinson, Criminal Law Defenses (1984) § 62(c)(3), p. 254.)

[16]  A related but distinct defense to a theft charge arises when the defendant misapprehends the legal status of property and because of a mistake of fact, e.g., through carelessness in identification, appropriates the property of another.  (See, e.g., *People v. Devine* (1892) 95 Cal. 227.)  While analytically distinct, these defenses to larceny are sometimes discussed as a unit.  (See, e.g., *People v. Butler* (1967) 65 Cal. 2d 569, 572-573.)  Presumably both defenses might be presented in one case.

[17]  "Good faith" sometimes entails an element of care.  (But see, generally, *Raab v. Casper* (1975) 51 Cal.App.3d 866, 872.)  "Good faith" is "ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation."  (*People v. Nunn* (1956) 46 Cal.2d 460, 468.) "Intention to defraud" includes false representations made in the actual belief that they were true if that belief is not based on reasonable grounds.
In light of Penal Code Section 490a, enacted in 1927, which provides that "theft" shall be substituted for "larceny, embezzlement, or stealing" in all statutes, Penal Code section 511 may now govern the defense of mistake of law as to every offense embodying theft.  We imply no view on whether the rationale concerning the construction of the term "good faith" should be extended to every variety of theft, regardless whether there is a violation of trust or conduct in the nature of fraud employed to gain dominion over the property in question.

the old road negates the malice required under Penal Code section 588 for the crime of malicious injury to a public highway.

*People v. Marsh, supra,* 58 Cal.2d at pages 742-744, presents the second most frequent occasion for a mistake of law defense, conspiracy to commit a crime. The defendant sold electric machines as a device to cure ailments and was charged with conspiracy to commit a misdemeanor violation of the Business and Professions Code section which prohibits the practice of medicine without a license. The Supreme Court said that the trial court erred in instructing the jury that conspiracy to commit a crime required only an agreement to commit the act which constituted the crime[18]:

> "[E]ven though a conspiracy has as its object the commission of an offense which can be committed without any specific intent, there is no criminal conspiracy absent a specific intent to violate the law. That is, to uphold a conviction for conspiracy to commit a 'public welfare offense' there must be a showing that the accused knew of the law and intended to violate it." (*Id.* at p. 743.)[19]

The rationale of *Marsh* is that the crime of conspiracy is defined in terms of an "'evil' or 'corrupt' agreement to do an unlawful act." (*Id.* at p. 743.) For this reason, where the target offense is a public welfare offense, i.e. one not wrongful per se, that is not shown unless there is proof the defendant knows that the target act is unlawful. This showing is unnecessary, however, where the act is *malum in se.*

The defense of mistake of law has long been recognized in cases not governed by express statutory language. The defense was recognized early on as to theft offenses other than embezzlement.[20] *People v. Eastman* (1888) 77 Cal. 171, 172, held, without extended discussion of the larceny statute, that "a mistaken idea of legal rights honestly entertained" was a defense in the case where a man, who pledged a mare, retook it from the owner and pledged it to another in the belief he could offset his claim for wages against the

---

[18] The jury was instructed: "Criminal intent is present whenever a person knowingly and voluntarily performs an act or acts which the law declares to be a crime. It does not require a knowledge that such conduct is wrong and may even exist in the presence of a belief that an act is right and lawful." (*Id.* at p. 742.)

[19] It should be noted that the term "specific intent", as used in these cases, is not the specific intent involved in the distinction between a general and specific intent. Rather it is specific in the literal sense of specifying the precise intent required for commission of the proscribed act.

[20] *Eastman* precedes the enactment of Penal Code section 490a; see footnote [15], ante.

amount due on the pledge.  *Eastman* reasons that the honest belief
negates the intent to steal required for larceny.[21]

From these cases we distill three ways in which a mistake of law
provides a defense to a charged crime.  The first occurs when a
statute, such as Penal Code section 511, provides that a specified
mistake of law affords a defense.  The second arises when the
mistake of law negatives the existence of a state of mind that is an
express element of the offense, e.g., as in *Eastmen* and *Goodin*.
The third arises when the claimed mistake of law negatives the
existence of an implied element of general mens rea (see Pen. Code
§ 20), as in *Marsh*.  (See Perkins & Boyce (3d ed. 1982) Criminal
Law, p. 1036.)

Generally stated, the doctrine provides that one's ignorance or
mistake as to a matter of law is a defense to a criminal charge when
it negatives the existence of a state of mind that is an element of
the offense or when it establishes a state of mind that constitutes a
defense under a rule of law relating to defenses.  (Also see, e.g., 1
Model Pen. Code & Commentaries (1985) § 2.04 and com. 1, pp.
267-272.)  The defense is available when the criminal law defining
the offense requires that the culpable act be committed with
knowledge, fraudulently or maliciously, and the culpable act is so
defined that ignorance or mistake regarding the law negates the
mental state.  (See, Perkins & Boyce, supra, Criminal Law, at pp.
1031-1036.)

The materiality of a claim of ignorance or a mistake as to a matter
of law necessarily turns on the precise elements of the offense or
defense.  Since the elements are prescribed (or implied) by statute
the question, in the first instance, "'appertains to the department of
statutory construction . . . .'" (*O'Brien, supra,* 96 Cal. App. 177,
quoting from *Halsted v. State,* 41 N.J.L. 552.)  The particular claim
must be assessed against the statutory elements to determine if the
mistake negates an express or implied element of the offense or
establishes a statutory defense.

Whether the bona fide mistaken belief or ignorance of the
defendant must have a reasonable basis turns on the same
considerations.  It also may be required where the theory of the
defense is absence of scienter.  The scienter requirement is
satisfied by criminal negligence, and the absence of any reasonable
basis for a mistaken belief or ignorance of the law would appear to
be sufficient.  However, where the defense goes to the negation of

---

[21]  The larceny statute at the time was Penal Code section 484, as enacted in 1872:
"Larceny is the felonious stealing, taking, carrying, leading, or driving away the personal
property of another."  The term "felonious" signifies the common law element of criminal intent
to steal, "animus furandi."  (See, e.g., *Butler, supra,* 65 Cal.2d at p. 572; 50 Am.Jur.2d, Larceny,
§ 35.)

a mental state which is an element of the offense, the relevance of good faith turns upon the nature of the element and the means of its negation.

. . .

In this case, two offenses are in issue.  They are similar in structure.  Each makes it an offense, "[to] willfully fail[] to [timely] file any return . . . with intent to evade any tax imposed by this [division or part] . . . ."  (Compare former Rev. & Tax Code, § 19406, former Unemp. Ins. Code, § 13095 and Unemp. Ins. Code, § 2117.5.)  There is no separate statutory defense.  For this reason a defense of ignorance or mistake of law is available only if it shows the absence of a mental state which is an element of the offense.

## D.

## Willful Omission to File

There are two mental states required as elements of the offenses at issue.  The first is a "willful" failure to file a required form.

We will assume for the sake of discussion that "willfully" is a word that has acquired "a peculiar and appropriate meaning in law" (Code Civ. Proc., § 16) such that when used in a penal statute outside the Penal Code it ordinarily must be construed as if subject to the Penal Code section 7 definition.  (See e.g., *People v. Mancha* (1974) 39 Cal.App.3d 703, 719.)

Penal Code section 7 provides:

" . . . unless otherwise apparent from the context:

"1.  The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate law, or to injure another, or to acquire any advantage."

The introductory clause says there may be statutory uses of "willfully", "apparent from the context", which are not defined or limited by section 7.  (See *In re M.S.* (1995) 10 Cal.4th 698, 713, fn. 5.)

Section 7 also defines "willfully" in a manner dependent upon its grammatical context, as the "intent with which an act is done", to wit, "a purpose or willingness to commit the act, or make the omission" proscribed by the criminal law.  It follows from this definition that what "willful" means is "entirely dependent upon

the act [or omission] to which [it] is appended . . . .  Its significance therefore is wholly dependent upon the grammar of the specific offense in which the term is employed." (*In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1066; see also *People v. Fabris, supra*, 31 Cal.App.4th at pp. 694-695.)

Where an offense is defined in terms of an omission, a failure to act, a violation can occur only where the defendant is under an existing legal duty to act.  (See *People v. Heitzman* (1994) 9 Cal.4th 189, 197.)

The "act" to which the term "willfully" is addressed in the statutes at issue is an omission to file a required tax form.  As applied to an omission to file such a form Penal Code section 7 requires "a purpose or willingness to . . . make the omission", necessarily requiring knowledge that the law of taxation imposes the obligation to file the form.

Thus, the willful failure to file the required form can be found only if the defendant knew that he was obliged under the law of taxation to file the form.[22]  That is to say, in the context of these tax statutes "willfully" requires an intent to violate the law in the sense of violating a known obligation to report as required.[23]

This straightforward reading of the tax statutes is reinforced by the consideration that there are allied misdemeanor offenses which do not require that the omission be willful, that proscribe the bare failure to file a return.  (See former Rev. & Tax. Code, § 19401, Stats. 1984, ch. 1490, § 36, now § 19701; former Unemp. Ins.

---

[22]  This is not to say that every willful omission requires knowledge that the law imposes a duty upon one to act.  (See Pen. Code, § 7, subd. (1).)  In at least one instance an omission by "willful violation" of a statute is expressly defined as a failure to comply with the statutory obligation when the defendant "reasonably should have known of his or her obligations under the public works law . . . ." (Lab. Code, § 1777.1.)

   Moreover, express statutory definition is not the only path to this result.  For example, an omission satisfying the description of a willful endangerment of an elder or dependent adult (Pen. Code, § 368) could require only knowledge that the person is endangered.  The criminal sanction is limited to those under a legal duty to act.  (See People v. Heitzman, supra, 9 Cal.4th at pp. 197-199.)  However, the statutory text - "willfully . . . permits the elder or dependent adult to be placed in a situation such that his or her person or health is endangered . . ." - can be applied regardless whether the defendant who fails to act knows that the law imposes a duty to act.

[23]  *People v. Smith* (1984) 155 Cal.App.3d 1103 addresses the parallel language in Revenue and Taxation Code section 19406 which proscribes willfully executing a false tax return with an intent to evade taxation.  Citing only federal tax case law, *Smith* asserts that "[t]he 'willful' element of both violations means defendant voluntarily and intentionally violated a known legal duty . . . ." (*Id.* at p. 1157, citations omitted.)

Code, § 13090, Stats. 1980, ch. 1007, § 64, and Unemp. Ins. Code, § 2117.)

Since the offenses defined by the tax statutes are not public welfare offenses, whose purpose is to protect public health and safety, a scienter element must be implied where none is specified, minimally requiring criminal negligence in the failure to file a return.  (See, e.g., *People v. Simon* (1995) 9 Cal.4th 493, 519-522; *People v. Allen* (1993) 20 Cal.App.4th 846, 851.)

The coupling of these correlative and distinct offenses, one requiring and one not requiring a "willful failure", reinforces the grammatical conclusion that "willfully", when it is used as in former Revenue and Taxation Code section 19406, now section 19706, requires more than criminal negligence, to wit, knowledge of the legal requirement to file a return.  (See *People v. Kuhn* (1963) 216 Cal.App.2d 695, 699; c.f., *In re Stonewall F., supra,* 208 Cal.App.3d at p. 1067; see generally, *Simon, supra,* 9 Cal.4th at p. 516.)

E.
Right to Evade Tax

There is a second and express mental state set out in the statute; the defendant's willful failure must be with the intent to evade the tax.  This requirement avoids rendering every willful failure to file a return felonious, e.g., where the taxpayer procrastinates and knowingly misses the filing deadline but intends to file and to pay the tax shortly thereafter.[24]

A mistake of law is material to the case if it negates the existence of one of these two mental states.

In this case, the [petitioner] fails to specify the particular claim or claims of ignorance or mistake of law he contends were tendered in the trial court.  He offers only the vague assertion that he put in issue a defense predicated on "his honest but mistaken belief that his conduct did not violate the law. . . ."  As related, insofar as this is a claim he was ignorant of the penal statutes under which he was convicted, it is immaterial.  Unless expressly prescribed, the lack of knowledge that the law proscribes an act is not a defense to the commission of the offense.

A defense is put in issue in a criminal proceeding, triggering an instruction, when there is substantial evidence supportive of the defense.  (E.g., *People v. Flannel* (1979) 25 Cal.3d 668, 684-685.)

---

[24]  Smith, supra, 155 Cal.App.3d at page 1157, offers a somewhat different explanation for the meaning of the statutory terms "willfully" and "with intent to evade taxation."  We cannot fathom the explanation.

In this context, "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)  It is the defendant's burden on appeal to establish error.  (See, e.g., 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 268, 479.)  Hence, to make out a claim of error in failing to instruct the [petitioner] must marshal the evidence which he contends warrants the requested instruction.

As the Attorney General notes, mistake of law in this case is material because it may in some cases bear on a requisite mental state element of the offense; thus it presents a problem in the realm of pinpoint instructions.  (See *People v. Saille, supra,* 54 Cal. 3d at pp. 1118-1119.)  Because a pinpoint instruction presupposes that the jury has been adequately instructed on the basic elements of the offense charged (*People v. Brady* (1987) 190 Cal.App.3d 124, 135), it is required "upon request when there is evidence supportive of the theory, but [is] not required to be given sua sponte." (*Saillie, supra,* at p. 1119.)

II

We next consider the evidence and the [petitioner's] arguments and request for instructions in the trial court in light of these precepts.

A.
Failure to File a Personal Income Tax Return

There is nothing in the evidence which supports an inference that the [petitioner's] failure to file a personal income tax return was not "willful" in the required sense, i.e., that [petitioner] did not know that the tax law obliged him to do so.  Given his age, attainments, the prevalence of knowledge of the state income tax obligation, and the fact that [petitioner] had been assessed in the past for underpayment of personal income taxes, there is nothing in the record that supports an inference that [petitioner] was unaware of the statutory obligation to file a return.  Since there is no evidence he was acting under a mistaken belief and he made no claim suggesting such a mistake, there was no need to instruct on any defense of this nature.

Nor does this evidence suggest that the [petitioner] failed to file the personal income tax returns without the intent to evade taxation because of some mistake or ignorance of the law.  Having knowledge of the obligation to report income, one who fails to do so for a protracted period is substantially certain that a result will be evasion of the tax.  [Petitioner] did assert in argument that he was relying on the reports of payments to him by insurance companies as a report of that income to the state government. However, even if failure to report this income is deemed not to be an evasion, the [petitioner] offered no explanation of how his

> reporting requirement was met with respect to the cash income received through the business.
>
> The only other suggestion [petitioner] made in argument was that he believes the requirement of filing a personal income tax return is unconstitutional. We need not resolve the question whether such a constitutionally-grounded belief negates a willful failure to file, i.e., knowledge of the legal obligation to file.[25] Here there is a total absence of evidence that the [petitioner] failed to file a return because he believed that he had no legal duty so to do grounded on the constitutional provisions he identified in his argument. The [petitioner's] closing argument is not evidence.
>
> That [petitioner] failed to pay because of the considerations announced in his closing argument is no more or less likely given the state of the evidence than a myriad of other suppositions that might be entertained to explain his failure to file. For example, one might suppose equally as well that he honestly believed he had insufficient income to require filing under the tax statutes or that he failed to file the tax return because a third party placed him under duress, threatening his life if he complied with the tax law. Speculation about the [petitioner's] mentation is an insufficient basis upon which to require instruction. (See *People v. Wilson* (1992) 3 Cal.4th 926, 942.) In sum, there was no requirement to instruct on mistake of law as to the failure to file an income tax return because there is no evidence upon which a jury could have found a reasonable doubt under this theory.

/////

/////

---

[25] The [petitioner] never provided any elaboration of these claims. The Fifth Amendment privilege does not extend to a taxpayer's failure to file any return. (See *United States v. Sullivan* (1927) 274 U.S. 259, 263-264 (71 L.Ed. 1037, 1039-1040]; *People v. McLemore* (1985) 166 Cal.App.3d 718, 720-721.)

In *Cheek v. United States* (1991) 498 U.S. 192 [112 L.Ed.2d 617] the Supreme Court faced a somewhat analogous question under federal tax law. As a matter of federal statutory construction the term "willfully", as used in the federal criminal tax statutes, had been construed to mean a voluntary, intentional violation of a known legal duty. (*Id.* at pp. 199-201 [112 L.Ed.2d at pp. 628-629.].) The [petitioner] asserted a defense of good faith belief that the income tax law is unconstitutional as applied to him. The majority opinion holds this is not a cognizable defense. (*Id.* at pp. 204-206 [112 L.Ed.2d at pp. 631-633].) The majority opinion distinguishes *United States v. Murdock* (1933) 290 U.S. 389 (78 L.Ed. 381), in which a conviction for willful refusal to answer questions of a revenue agent was reversed for failure to instruct that a good faith refusal to answer the questions on the grounds of a claim against self incrimination was a defense, as a case not grounded in the Constitution, but a privilege not to answer, for which federal tax law provided no remedial procedure. (*Cheek*, 498 U.S. at p. 205 [112 L. Ed.2d at p. 632], fn. 10.)

### B.
### Failure to File Employee Payroll Withholding Tax Returns

That leaves the offense of willful failure to file employee payroll withholding tax returns.

The [petitioner] asserted in his closing argument that the workers in his office were independent contractors. If that had been the case the [petitioner] would have had no legal obligation to file a return listing the payments to these workers, or to tender withholding taxes.

The obligation to file a return under Unemployment Insurance Code section 13021 pertains to employers who pay wages to "employees." (Unemp. Ins. Code, §§ 13020-13021.) Whether an individual is an employee for these purposes is determined by the usual common law rules applicable in determining an employer-employee relationship. (22 Cal. Code Regs. § 4304-1.)[26] The determination of the status is one of fact if it is dependent upon the resolution of disputed evidence or inferences and one of law if the evidence is undisputed. (See, e.g., *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431-432; c.f., e.g., *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349.)

Here there is no material dispute of fact concerning the status of the [petitioner's] workers. As a matter of law, under the test of an employee relationship of 22 California Code of Regulations section 4304.1 (fn. 17, *ante*), at least some of the workers in the [petitioner's] clinic were employees.[27]

---

[26] 22 California Code of Regulations, section 4304-1, says that the common law rules apply and provides the following guidance. The most important factor in establishing the employer-employee relationship is the right of the principal to control the manner and means of accomplishing the desired result. The right of the principal to discharge at will is strong evidence of this. In equivocal cases various factors should be taken into consideration, including whether the putative employee is engaged in a separately established occupation or business, whether such work is usually done without supervision by the principal, the skill required, whether the principal provides the instrumentalities, tools, and place of work, the duration of the work, the method of payment, whether the work is part of the regular business of the principal, whether the parties believe they are creating an employer-employee relationship, the extent of actual control exercised by the principal, whether the principal receives the benefits of the service in a business enterprise capacity. (*Id.* subd. (a)(1)-(a)(10).)
As to the belief of the parties, the regulation provides that an agreement that the relationship is one of principal and independent contractor is evidence of their intent. Regardless of such an avowal, if the relationship, as described in the agreement or in actual fact, entails the right of control by the principal, it is an employer-employee relationship. (*Id.* subd. (b)(5).)

[27] The [petitioner] was required to file a return if any of the workers were employees. Accordingly, the [petitioner's] contention on appeal that the trial court erred in failing to instruct

1
2
3
4
5
6
7
8

It is conceivable that the [petitioner] nonetheless honestly believed
that all of the workers in his office were independent contractors
under the law and for that reason did not know that he was obliged
to file employee payroll withholding tax returns.  Here again,
however, there is an absence of evidence that this is the reason that
the [petitioner] failed to make the required filing.  The only
assertion of the [petitioner] in the evidence concerning his reason
for failing to withhold taxes of his workers is his generic
explanation to Hibler that he did not believe that paying taxes was
legal or an obligation and would not force others to do so.  Once
again, his assertion in closing argument that he believed his
employees were independent contractors is not evidence.  The trial
court was not constrained to give an instruction on a defense
predicated on such an unsworn assertion.  In sum, the trial court
did not err in declining his requested instruction on this defense.

9   (People v. Barrett, slip op. at 6-25.)

10          Petitioner argues the trial court erred by failing to give his requested instructions

11   on mistake of law as well as mens rea, and the difference between independent contractors and

12   employees.  Petitioner contends the offenses charged are specific intent crimes and the requested

13   instructions were appropriate as pinpoint instructions.

14          Where a trial court fails "to properly instruct the jury regarding an element of the

15   charged crime," the court commits "a constitutional error that deprives the defendant of due

16   process."  Conde v. Henry, 198 F.3d 734, 740 (9th Cir. 1999) (quoting Hennessy v. Goldsmith,

17   929 F.2d 511, 514 (9th Cir. 1991)).  However, harmless error analysis is ordinarily applied to

18   trial errors, including a jury instruction that actually omits an element of the offense.  See Neder

19   v. United States, 527 U.S. 1, 8, 11 (1999).  In determining whether the trial court's error in

20   failing to give an instruction on intent as an element of the counts of willful failure to file

21   personal income tax returns and quarterly employee payroll withholding tax returns, with intent

22   to evade a tax, entitles petitioner to habeas relief, this court must ask "whether the error had a

23

24   sua sponte in more detail on the law concerning the employer/employee and
principal/independent contractor relationships so that the jury could determine the nature of the
relationships as a matter of fact is not meritorious.  Since some of the workers were incontestably
25   employees, the ordinary term "employee" adequately conveyed the criteria of the required
relationship; the case presents no material issue of non-existence of the relationship on technical
26   grounds.  (See People v. Rogers (1985) 172 Cal.App.3d 502, 513-514.)

1  substantial and injurious effect" on the outcome of the trial.  Brecht v. Abrahamson, 507 U.S.

2  619, 637 (1993).  Under this standard of review, a habeas court may not grant habeas relief

3  unless petitioner can establish that, as a result of the state trial court's error, he suffered "actual

4  prejudice;" i.e., that as a result of the error, the outcome of the trial was rendered fundamentally

5  unfair.  Id.[28]

6        Petitioner proposed numerous instructions and the trial court agreed to read some

7  and declined to read others.  (CT 2182-2278.)

8        The jury was read the details of each charge.  (RT 370-71.)  The jury was

9  instructed to consider each count separately and:

10        [i]n each of the crimes charged in the information, there must [be] .
          . . a certain specific intent in the mind of the perpetrator.  Unless . .
11        . such specific intent exists, the crime to which it relates is not
          committed.  The specific intent required is included in the
12        definitions of the crimes.

13  (RT 372.)  The jury was charged to prove each element:

14        One, the [petitioner] was a person required to file a California state
          personal tax return.  Two, the [petitioner] willfully failed to file
15        such a return with the Franchise Tax Board on or before the 15th
          day of April following the close of the calendar year; and three the
16        [petitioner] did so with the intent to evade California State personal
          income taxes.

17
          The specific intent with which an act is done may be shown by the
18        circumstances surrounding the commission of the act.  And I
          previously defined for you in the general instructions how you can
19        consider circumstances as they relate to a specific intent and I'll
          refer you back to that definition.  An act committed or an omission
20        made under ignorance of mistake of fact which disproved any
          criminal intent is not a crime.  Thus a person is not guilty of a
21        crime if he commits an act or omits to act under an honest belief in

22  /////

23

24  [28]  The conclusion of the California Court of Appeal that the trial court erred as a matter
     of state law when it gave CALJIC 1.22 at petitioner's trial is not reviewable in this federal habeas
25   corpus proceeding.  See Estelle, 502 U.S. at 67-68 (a federal writ is not available for alleged error
     in the interpretation or application of state law); Park, 202 F.3d at 1149 (same).  The issue before
26   this court is whether the erroneous jury instruction violated petitioner's federal constitutional
     rights.

1          the existence of certain facts and circumstances which, if true,
           would make such an act or omission, lawful.

2

3    (RT 373.)

4          If you have a reasonable doubt that the [petitioner] may have acted
           in pursuance of a mistaken attempt at tax avoidance, rather than an
5          attempted tax evasion, then you may not find an intent to evade
           payment of such tax, regardless of whether [petitioner's] mistake,
6          if it be such, was reasonable or unreasonable.

7          To escape taxation by methods permitted by law is not illegal and
           is not an evasion of taxation.
8
           The intent to evade taxes, which is an element of all the crimes
9          charged against the [petitioner], means an intent to elude or avoid
           the payment of taxes lawfully done – lawfully due by some device
10         or strategy or artifice, or by the concealment of, or the intentional
           withholding of some fact or facts which is or required or are
11         required to be communicated.

12         Evasion implies the avoidance of or escape from taxes lawfully due
           by a wrongful act, or by a failure to act in accordance with the
13         requirements of law, as distinguished from an avoidance permitted
           by law.  When an act is condemned as an evasion, what is meant is
14         that it is on the wrong side of the line indicated by the letter of the
           law.
15

16   (RT 375-76.)  The jury was reminded that with regard to the crimes charged in counts 1 and 2

17   "there must exist a union or joint operation of act or conduct and a specific intent in the mind of

18   the perpetrator, [and] [u]nless such specific intent exists, the crime to which it relates is not

19   committed."  (RT 376.)  The jury was instructed that if "convinced beyond a reasonable doubt

20   that the [petitioner] was a person required by law to file returns, and the [petitioner] willfully,

21   and with intent to evade taxes, failed to file returns within the time required by law, then you

22   must find the [petitioner] guilty of violating Sections 13095 and 2117.5 of the Unemployment

23   Insurance Code."  (RT 376-77.)  "The word willfully when applied to the intent with which an

24   act is committed means with a purpose or willingness to commit the act or to make the omission

25   in question."  (RT 377.)

26   /////

1    While instructing the jury on the lesser included offenses, the trial judge pointed

2 out that "what's missing is number three, which is the specific intent that's required for the

3 felony counts."  (RT 381.)  The judge pointed out twice more that the misdemeanor charges were

4 to be considered "without regard to the [petitioner's] intent.  (RT 381; 382.)

5    "A trial court must instruct the jury on a defendant's theory of the case only if the

6 evidence sufficiently supports the theory and the theory is supported by law." United States v.

7 Ravel, 930 F.2d 721, 726 (9th Cir. 1991) (citation omitted).  Jury instructions are reviewed for

8 adequacy in light of the entire charge.  United States v. Mundi, 892 F.2d 817, 818 (9th Cir.1989),

9 cert. denied, 111 S.Ct. 1092 (1991).

10    The jury instructions, taken as a whole, make it clear that in order to find

11 petitioner guilty of the felony charges, the jury must find petitioner had the specific intent to

12 willfully fail to file the tax returns with the intent to evade taxes.  The state court's decision that

13 the trial court did not err in refusing petitioner's proposed mistake of law instruction was not

14 contrary to, or an unreasonable application of, clearly established Federal law.  The state court

15 found there was no evidence to support an inference that petitioner's failure to file a personal

16 income tax was not willful, primarily because petitioner did not testify and did not call any

17 witnesses on his own behalf.  Petitioner argues there was sufficient evidence adduced through

18 witnesses Hibler and Walsh to demonstrate petitioner misunderstood his tax obligations.

19 However, a "mere scintilla" of evidence supporting a defense theory is not sufficient to warrant a

20 defense instruction.  United States v. Jackson, 726 F.2d 1466, 1468 (9th Cir. 1984).  The record

21 does not support a finding that there was substantial evidence to support a mistake of law

22 instruction.  The jury was properly instructed on specific intent and the definition of willfully and

23 clearly instructed that the jury must find a "union or joint operation of act or conduct" (RT 376)

24 along with petitioner's specific intent before petitioner could be found guilty.  Thus, petitioner's

25 second claim should be denied.

26 /////

1    Petitioner's arguments with regard to the independent contractor status of the

2  employees are equally unavailing.  A defendant is entitled to jury instructions that present the

3  crux of his defense, but he is not entitled to specific instructions that pinpoint certain aspects of

4  the defense or that suggest conclusions from certain pieces of evidence.  See Bradley v. Duncan,

5  315 F.3d 1091, 1098-99 (9th Cir.2002); United States v. Del Muro, 87 F.3d 1078, 1081 (9th

6  Cir.1996).

7    In this case, the trial court presented adequate instructions regarding petitioner's

8  theory of mistaken attempt at tax avoidance.  (RT 375.)  After review of the record herein, this

9  court finds that the trial court's failure to *sua sponte* instruct the jury with a definition of the

10 terms "independent contractor" and "employee" did not render petitioner's trial fundamentally

11 unfair.  The state court of appeal's rejection of this claim was neither contrary to, nor an

12 unreasonable application of applicable principles of federal law.  Petitioner's third claim for

13 relief should be denied.

14    In accordance with the above, IT IS HEREBY RECOMMENDED that

15 petitioner's application for writ of habeas corpus be denied.

16    These findings and recommendations are submitted to the United States District

17 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

18 after being served with these findings and recommendations, any party may file written

19 objections with the court and serve a copy on all parties.  Such a document should be captioned

20 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised

21 that failure to file objections within the specified time may waive the right to appeal the District

22 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23 DATED:  November 14, 2006.

24

25                                      UNITED STATES MAGISTRATE JUDGE

26 001;barr1106.157